**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **ROYAL TEN CATE USA, INC., et al.** | § | |
| | § | |
| **v.** | § | **A-11-CA-1057 LY** |
| | § | |
| **TTAH TRUST CO. LIMITED, et al.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
UNITED STATES DISTRICT JUDGE

Before the Court are: Defendants' Motion to Dismiss for Forum Non Conveniens or, Alternatively, Abstain in Favor of New Zealand Forum (Clerk's Doc. No. 77) filed September 24, 2012; Plaintiffs' Response in Opposition to Defendants' "Motion to Dismiss for Forum Non Conveniens or, Alternatively, Abstain in Favor of New Zealand Forum" (Clerk's Doc. No. 87) filed October 18, 2012; and Defendants' Reply (Clerk's Doc. No. 92) filed November 1, 2012.   The District Court referred these Motions to the undersigned Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72 and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, as amended.

## I.  Procedural Background

This case was filed on December 9, 2011.  Plaintiffs filed their Amended Complaint (Clerk's Doc. No. 39) on April 19, 2012.  In their Amended Complaint, Plaintiffs, Royal Ten Cate USA, Inc., a Delaware corporation, Koninklijke Ten Cate N.V., a Dutch company, and Ten Cate UK Limited, a British company (collectively, "TenCate") allege that the Defendants breached warranties contained in an Acquisition Agreement the Plaintiffs entered into on February 4, 2009, with two

New Zealand companies, TTAH Limited f/k/a Tiger Turf Americas Holdings Limited ("TTAH"), and TT Investors Limited f/k/a Tiger Turf International Limited ("TTI"). The Acquisition Agreement was negotiated and executed in New Zealand, and is expressly governed by New Zealand law.

In brief, the Agreement called for TenCate to purchase from TTI and TTAH the shares in four of their operating subsidiaries. TTI agreed to sell stock in its New Zealand operating subsidiary ("TTNZ") and its Australian subsidiary ("TTAust") to TenCate and its shares in its UK operating subsidiary ("TTUK") to TenCate UK. TTAH agreed to sell to Royal TenCate USA its stock in TigerSports Americas Inc., ("TigerSports"), a Texas corporation with its principal place of business in Austin. The shares in these operating subsidiaries were to be sold in three parcels, the first of 49% of the stock, the second 31%, and the last 20%. TenCate purchased the first two parcels in accordance with the Agreement, but in late March, 2011, when TTl and TTAH sought to exercise their option to sell the final segment, TenCate asserted that it was entitled to offset the price of those shares against losses it claimed arose from TTI and TTAH's alleged breaches of certain warranties contained in the Agreement. Specifically, the Defendants made a number of warranties pertaining to the business of TigerSports, which included warranties regarding whether TigerSports had any contingent liabilities. TenCate alleges in this suit that Defendants did not disclose various claims by customers that the TigerSports turf grass product was subpar, and that this failure constituted a breach of its warranty obligations under the Agreement.

In July 2011, before it filed suit in this court, TenCate initiated an "Expert Determination" proceeding in New Zealand pursuant to Clause 30 of the Agreement. Clause 30 provides that before a TenCate purchasing entity may withhold payment based on a claimed breach of any warranty contained in the Agreement, the claim must be reviewed  by an expert to determine whether it is

bona fide and has a reasonable chance of success.  When TTAH responded to TenCate's notice of its intent to offset claimed losses by denying it had breached any warranties, TenCate initiated an expert determination proceeding as called for in the Agreement.  This proceeding remains pending in New Zealand and the expert is expected to render his decision "very shortly."  After initiating that proceeding, TenCate filed this lawsuit, alleging that TTI and TTAH breached warranties in the Acquisition Agreement.  On December 22, 2011, TTI and TTAH filed their own lawsuit in the High Court of New Zealand alleging TenCate breached the Agreement by setting off its alleged losses and by failing to pay the full price for the last round of stock.  TenCate sought a stay of the New Zealand proceeding in deference to this case, but the New Zealand court denied that request.  TenCate concedes that it could bring the warranty claims pending in this court as counterclaims in the New Zealand case.

In March of 2012, Defendants moved to dismiss TenCate's claims, contending that the Court lacks personal jurisdiction over TTI and TTAH.  TenCate disagrees, and argues that the Defendants have significant contacts with this forum.  TenCate also asked that the Court permit it to conduct jurisdictional discovery before ruling on the Defendants' motion to dismiss.  On June 22, 2012, the undersigned granted this request.  As the parties completed their post-discovery, supplemental briefing on the jurisdictional issue, on September 24, 2012, TTI and TTAH filed a motion to dismiss on the basis of forum non conveniens.  The motion was referred to the undersigned on October 19, 2012.

## II.   Priority of Motions

The Fifth Circuit recently explained how a court should approach the prioritization of forum non conviens and jurisdictional motions.  *Ibarra v. Orica United States of America Inc.*, 2012 WL 4353436 (5th Cir. Sept. 24, 2012) (unpublished).  The Circuit, relying on the Supreme Court's

holding in *Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007),

explained that:

> [A] district court has discretion to respond at once to a defendant's
> forum non conveniens plea, and need not take up first any other
> threshold objection. In particular, a court need not resolve whether it
> has authority to adjudicate the cause (subject-matter jurisdiction) or
> personal jurisdiction over the defendant if it determines that, in any
> event, a foreign tribunal is plainly the more suitable arbiter of the
> merits of the case.

*Ibarra v. Orica United States of America Inc.*, 2012 WL 4353436 at *2-3 (citing *Sinochem,* 549 U.S.

at 432).   *Ibarra* noted that a trial court may move straight to forum non conveniens issues "when

considerations of convenience, fairness, and judicial economy so warrant." *Id.*  Where, for example,

the questions of subject-matter or personal jurisdiction are not complicated, "the proper course

would be to dismiss on that ground."  *Sinochem,* 549 U.S. at 436.  But where these jurisdictional

questions are "difficult to determine, and forum non conveniens considerations weigh heavily in

favor of dismissal," the court may properly take the "less burdensome course" of taking up the forum

non conveniens motion first.   *Id.*

As will be seen in what follows, the forum non conveniens analysis in this case is fairly

straightforward, and points clearly to the dismissal of this case in deference to the proceeding

pending in the New Zealand High Court.  On the other hand, the question of whether this Court has

jurisdiction over TTI and TTAH is far more complex.   Accordingly, the Court's analysis

begins—and ends—with the question of whether this is the appropriate forum for the resolution of

this international commercial dispute.

### III.  Analysis

Dismissal on  forum non conveniens grounds in permitted either when there is an alternative

forum with jurisdiction to hear the case, and trial in the original forum would be "oppressive" and

4

"vexatious" to a defendant "out of all proportion to plaintiff's convenience," or when the chosen forum is undesirable "because of considerations affecting the court's own administrative and legal problems." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447–48 (1994)). In resolving a motion to dismiss on forum non conveniens grounds, a court should assess a "range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." *Id.* (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996)).

There are two steps to the analysis. First, the court must determine whether there is "an available and adequate alternative forum" and second, whether the balance of certain private and public factors favors dismissal in lieu of the alternative forum. *Adams v. Merck & Co. Inc.*, 353 F. App'x 960, 962 (5th Cir. 2009) (quoting *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003)). The Court will address each of these requirements in turn.

## A.    Existence of an Adequate and Available Alternative Forum

Defendants assert that New Zealand is an available, adequate alternative forum with jurisdiction over TenCate's claims. A foreign forum is "available" when that forum has jurisdiction over the entire case and all of the parties, and is "adequate" when the forum will provide the parties with appropriate remedies and fair treatment, "even though they may not enjoy the same benefits as they might receive in an American court." *Adams v. Merck & Co. Inc.*, 353 F. App'x 960, 962 (5th Cir. 2009). Plaintiffs do not dispute that New Zealand is an "available" and "adequate" forum. Plaintiffs' Response (Clerk's Doc. No. 87) at p. 13. Plaintiffs (and Defendants) agreed to submit to the jurisdiction of New Zealand courts in the Agreement, which automatically establishes that country's courts as adequate and available. *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 728

5

(5th Cir. 1990). Indeed, TenCate itself initiated the Expert Proceeding in New Zealand. Added to this is the fact that the Agreement is expressly governed by New Zealand law, both Defendants are New Zealand residents, and none of the Plaintiffs are Texas residents. The adequacy and availability of the New Zealand forum is beyond dispute.

> **B.**    **Private and Public Interest Factors**

The second step of the forum non conveniens analysis requires the Court to consider several factors pertaining to both the interests of the litigants and of the public. *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447–48 (1994)). "This list of considerations to be balanced is by no means exhaustive, and some factors may not be relevant in the context of a particular case." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528–29 (1988). The private interest factors are: (1) relative ease of access to sources of proof, (2) availability of compulsory process for attendance of unwilling witnesses, (3) the cost of obtaining attendance of willing witnesses, (4) possibility of view of premises, if view would be appropriate to the action, (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *See Am. Dredging*, 510 U.S. at 448 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947)). The public interest factors are: (1) administrative difficulties for the court flowing from docket congestion, (2) the local interest in having localized controversies decided at home, (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action, (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law, and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821 F.2d 1147, 1162–63 (5th Cir. 1987), vacated on other grounds, 490 U.S. 1032 (1989). The Court considers each of these factors in turn.

## 1.      Relative Ease of Access to Sources of Proof

TenCate argues that the documents pertaining to the warranty claims are located at TSA's headquarters in Austin, Texas, and thus ease of access to proof points to a Texas forum.  TenCate asserts that the "warranty facts" have a strong connection to Texas because all of the claims about subpar turf were presented to TSA at its headquarters in Austin.  It further claims the evidence already submitted in the Expert Determination Proceeding shows a close connection between the proof and this forum because three witnesses who have submitted affidavits on behalf of TenCate (all employees of TSA) are Texas residents.  TenCate also argues that the state of athletic fields located in the United States is relevant to the resolution of the breach of warranty claim in this suit, and that evidence is plainly located in the United States.  TTI and TTAH respond that the crux of TenCate's warranty claim involves whether the TTAH directors erred by not expressly identifying potential warranty claims for defectively installed fields in North America.[1]  Defendants also point out—quite rightly—that documents are easily transportable.

TenCate's argument overstates the importance of the Texas-based evidence.  As Defendants note, while the existence of the TSA customers' claims is relevant, the focus of this suit is not on the merits of the complaints against TSA.  Rather, the warranty claim focuses on TTI and TTAH, and the obligation imposed on them by the Agreement to discover and disclose contingent liabilities.  The Agreement expressly imposed an obligation on Defendants TTI and TTAH to disclose to TenCate any contingent liabilities in conjunction with the Acquisition Agreement.  It is the TTI and TTAH employees who conducted the due diligence on this point, and those to whom they reported,

---

[1]Claims had been asserted regarding eight fields in North America at the time of the closing of the Acquisition Agreement.  Of those eight, one is located in Mexico, one in Canada, one in Pennsylvania, and five in California.

who are central to the case.  The actual or constructive knowledge of TTI and TTAH—rather than just that of the TSA employees—will determine the Defendants' liability on TenCate's warranty claims.  Just one example of this is the fact that the Agreement exempted from disclosure contingent liabilities which, in the opinion of the directors, were unlikely to be asserted or were subject to offset.  The proof—documentary or otherwise—regarding the directors' opinions lies mainly outside the United States and Texas.  And whatever documentary proof that does exist in this forum is easily transportable to New Zealand.

On balance, this factor weighs against a Texas forum.  TenCate is already presenting the Texas-based evidence in a New Zealand proceeding, thus demonstrating its ability to do so in a court there.  The merits of the claims against TSA are of minor importance.  Instead, what is relevant is what those responsible for making disclosures knew about the claims, how they perceived those claims, whether they were obligated to disclose the claims in the sale, whether they did so, and if not, why not.[2]

### 2.    Availability of Compulsory Process for Attendance of Unwilling Witnesses

TTI and TTAH contend that almost all the key witnesses are non-United States residents, and that this court lacks the power to compel the attendance of these witnesses at trial.  The Defendants identify a number of "key" witnesses.  The largest group reside in New Zealand:

- Graham Vivian (director and majority stockholder of TTAH and TTI);

- Peter Leeves and Ian Fulton (former directors of TTI and TSA);

- Robert Bell (the former Chief Operating Officer of TSA);

---

[2]TenCate's recently-identified complaints about EBITDA (earnings before interest, taxes, depreciation and amortization)  inaccuracies will not involve any proof from Texas—those claims will be resolved purely by the testimony of New Zealand-based financial professionals.

- Murray Page  (the former Chief Financial Officer of TTNZ);

- David Darrington and Mark Averill of PricewaterhouseCoopers (both were heavily involved in the acquisition process);

- Raewyn Lovett (the attorney for the Defendants);

- Arthur Borren (a director of all four operating subsidiaries); and

- Don Crockett (field installer currently employed by TTNZ).

The next largest group reside outside the United States.  These witnesses include:

- Robin Craven (UK resident employed by Defendants' UK subsidiary);

- Ron Knott (an independent contractor based in Thailand);

- Chris Simpson (Australian resident who ran the Australian operating subsidiary);

- Bryn Lee (UK resident who ran TTUK, the UK operating subsidiary);

- Peter van Steenbergen (Dutch citizen who conducted due diligence for Plaintiffs);

- Loek de Vries (Dutch resident who is the CEO of Plaintiffs' parent, Royal TenCate);

- Jaap Lock (Royal TenCate's CFO who also resides in the Netherlands); and

- Geert Dielessen (Dutch resident who is an attorney for TenCate).

According to Defendants, the only two US residents who are key witnesses are Harry Salomons and Charles Fleishman (former employees of non-party TSA).  They note, however, that both men have contractual obligations to cooperate with TenCate and TenCate can thus compel them to appear in New Zealand for trial.  On the other hand, Defendants assert that the majority of their witnesses who live outside the United States are not their employees and cannot easily be compelled to appear at a trial in the United States.  They further note that the New Zealand court allows trial evidence via video link, which would provide a means for the Texas witnesses to appear in the New Zealand court without having to travel.  (This would of course also be true for other non-New Zealand witnesses.)

TenCate disagrees with the Defendants on what testimony is important, and criticizes the Defendants for failing to explain why the foreign witnesses are central to the case.  While TenCate does not identify any other witnesses it views as central to its case, it contends that because all of the customer claims involved TSA, and were made to TSA's officers or employees in Texas, the two former TSA employees—Salomons and Fleischman—are by far the most important witnesses. TenCate argues that Defendants have failed to offer any evidence that TSA's management team forwarded any information about warranty claims to any of the parent companies in New Zealand, and thus eight people who will all say "we didn't know anything about the customer complaints" is not "key" testimony, and would be cumulative and of little import.  TenCate does concede, however, that Vivian and Fulton, both of New Zealand, along with UK citizen Craven and Netherlands resident van Steenbergen, are important witnesses on the warranty dispute.  Plaintiffs also point out that Defendants make no effort to identify which of the foreign witnesses would be unwilling to testify voluntarily, and allege that many of these individuals would likely be willing to travel to Texas on behalf of Graham Vivian.

While some of TenCate's points have merit, on balance the Court agrees with the Defendants.  Distilled to its essence, this case involves a dispute about a contract executed in New Zealand for the sale of four businesses, only one of which is located in the US.  The contract was entered into by two New Zealand companies on one side and a Dutch company and its British and Delaware subsidiaries on the other.  The Delaware subsidiary has its headquarters in Georgia, not Texas.  Indeed, none of the parties to the transaction have ties to Texas.  Although TSA was at least in part the subject matter, or *res*, of the contract, the fact that TSA was headquartered in Texas was far from a fundamental aspect of the Acquisition Agreement.  The fact that two witnesses reside in Texas is greatly overshadowed by the fact that all of the other witnesses are outside the United

States, that none of the parties to the Agreement reside in Texas, the Agreement was executed in New Zealand, and the parties with the obligations to make accurate warranties under the Agreement reside outside of the United States. The vast majority of witnesses are not subject to process in the United States, and those that are may testify in New Zealand via video link. This factor weighs in favor of a New Zealand forum.

### 3.      The Cost of Obtaining Attendance of Willing Witnesses

Defendants argue that the cost for the parties to fly willing or controlled witnesses from New Zealand to the United States would be immense. Defendants ask the Court to take judicial notice of the fact that a round trip plane ticket from Auckland, New Zealand, to Austin, Texas, costs approximately $2,000 and the total flight time is approximately 24 hours. Plaintiffs respond that Defendants fail to note the cost of a flight for the European witnesses to fly from Europe to New Zealand is likely much higher than the cost for those same witnesses to fly from Europe to Austin.

Defendants have asserted that witnesses may testify via video link in the New Zealand court, and TenCate does not dispute this, which undercuts the necessity of having Texas witnesses travel to a trial in New Zealand. Thus the low cost of obtaining the attendance of Texas witnesses in the New Zealand court, contrasted with the high cost of transporting witnesses from Auckland to Austin, weighs in favor of dismissal.

### 4.      Possibility of View of Premises

Defendants proffer no argument that there is a need to view any premises. TenCate states in its Response that it is unaware of any reason why a fact-finder would need to view any of the any of the allegedly defective turf fields, but that to the extent experts need to opine on the state of the fields, they would have to travel to the US to do so. Response at p. 15. The Court is unaware of any reason why the fields themselves would need to be examined, as the actual product liability

11

claims are not part of this case.  What is at issue is the failure to disclose the claims.  Further, even if the fields need to be reviewed by experts, they are scattered from Mexico to Canada, and thus maintaining the case in Texas would have little bearing on ease of access to the relevant "premises."

     **5.**       **All Other Practical Problems, Including Timeliness of Motion**

     TenCate argues that this motion is untimely.  It contends that Defendants could and should have filed the motion at the same time they filed their original motions to dismiss.  TTI and TTAH respond that they had no notion that the jurisdictional dispute would be so prolonged, and that they filed their forum non conveniens motion only after it became clear that the jurisdictional submissions would be further delayed and that efficiency would actually be served by filing the motion immediately.  The Court notes that it was TenCate that requested additional time to conduct jurisdictional discovery, and thus that a ruling on all pending motions has been delayed, at least in part, by circumstances of Plaintiffs' own creation. Moreover, the duration of the case's pendency until now is otherwise not determinative absent some indication that TenCate will be prejudiced by dismissal.  Actions that have been pending just as long and longer have been dismissed on forum non conveniens grounds.  *See, e.g., Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G.*, 955 F.2d 368, 370-71, 373-74 (5th Cir. 1992) (affirming dismissal of suit on forum non conveniens grounds after eight years of litigation, where the United States parties had settled out, leaving only foreign litigants); *see also, e.g., Ionescu v. E.F. Hutton & Co. (France) S.A.*, 465 F.Supp. 139, 140-41, 147 (D.C. N.Y. 1979) (granting motion to dismiss for forum non conveniens over two years after suit filed).  Case law mandates only that a motion to dismiss for forum non conveniens be filed "within a reasonable time after the facts or circumstances which serve as the basis for the motion have developed. . . ." *In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1165.  This case has not proceeded to merits discovery, nor has the deadline for dispositive

motions passed.  Moreover, the litigation in New Zealand has been ongoing throughout this time, and thus TenCate can pursue its claims in that forum without having to start from scratch.  The Court rejects Ten Cate's untimeliness argument.

Finally, other considerations also favor deferring to the New Zealand High Court proceeding. As noted above, TenCate commenced the underlying warranty dispute by initiating the Expert Proceeding in New Zealand.  Although that proceeding is not a prerequisite to suit nor a preclusive determination on the merits of Plaintiffs' warranty claims, it will resolve whether Plaintiffs are entitled to offset some part of the unpaid purchase price due to the alleged breach of warranty claims pending their adjudication by a court of law.  The fact that all parties are already litigating these issues in New Zealand is a factor favoring a New Zealand forum.

### 6.    Docket Congestion

The first public factor the Court considers is whether there are or would be any administrative difficulties for either the original or the alternative forum flowing from docket congestion.  Here this is a non-factor, as neither party presents any evidence of docket congestion in the relevant New Zealand court.  The Court's docket here, while very busy, would not preclude it reaching this case in a reasonable time frame.

### 7.    The Local Interest in Having Localized Controversies Decided at Home

Defendants note that no party to this dispute resides in Texas and that Texas has absolutely no interest in having this dispute resolved by a Texas court.  Defendants further note that the one Plaintiff that is a resident of the United States is a Delaware—not Texas—corporation.  Plaintiffs respond that this case deals with the sale of stock of a Texas company to a Delaware corporation regarding the failure to disclose warranty claims made in North America, and thus Texas has a local interest in the controversy.

Texas' local interest in the controversy is minimal at best.  None of the parties to the Acquisition Agreement are from Texas.  The fact that one of the four operating entities purchased in the transaction was a Texas company is insufficient to create a local interest when both the buyer and the seller were foreign corporations.  New Zealand has a much greater interest in the resolution of this dispute than Texas does.  *See Syndicate 420 at Lloyd's London v. Early Amer. Ins. Co.*, 796 F.2d 821, 831-32 (5th Cir. 1986) (finding that a case involving claims by Lloyds that it should not be held liable on reinsurance issued to an Alabama corporation and a Delaware corporation did not present a "local controversy" simply because the underlying risks for which the reinsurance had been issued were located in Louisiana).

### 8.    The Interest in Having the Trial before a Court Familiar with the Law Governing the Action and Avoiding Conflicts of Law Issues

Although TenCate concedes that the Agreement is governed by New Zealand law, it asserts that no one has shown that there is a conflict between New Zealand and Texas law on the relevant issues.  And, Plaintiffs argue, even if New Zealand law does apply, such a consideration would not require dismissal, because the District Court could easily apply New Zealand law.  While this Court is certainly capable of applying New Zealand law, there can be little question that it will be much simpler for a New Zealand court to interpret and apply New Zealand law than for this Court to do so.  This factor plainly favors a New Zealand forum.

### 9.    The Unfairness of Burdening Citizens in an Unrelated Forum with Jury Duty

The final public interest factor, the interest in avoiding an unfair burden on citizens in an unrelated forum with jury duty, also weighs in favor of dismissal.  As previously noted, New Zealand has a far greater interest in this case than does Texas. In addition, this case has at most minor connections with the Western District of Texas.  In reality, the only connection with this district is

the fact that one of the four companies that was sold in the Acquisition Agreement had its headquarters in Austin.  While the unfairness of subjecting jurors to duty on this case would not be extreme, it certainly is not a factor that favors a Texas forum.  *See In re Bridgestone/Firestone, Inc., Tires Prod. Liab. Action*, 420 F.3d 702 (7th Cir. 2005) ("The citizens of the Western District of Texas have no connection to the Mañez–Reyes accident.  The family does not reside there, the accident did not occur there, and the tires at issue were neither designed nor manufactured there.")

### 10.     Balance of Factors

The Supreme Court has instructed that "[t]he forum non conveniens determination is committed to the sound discretion of the trial court." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).  After considering all the relevant private and public factors, it is plain that a New Zealand court is the appropriate forum for this case.

The movant ordinarily bears a heavy burden in overcoming the forum chosen by the plaintiff.  Relying on this principle, TenCate argues that its choice of forum is entitled to substantial deference because Royal Ten Cate USA, Inc., is an American citizen—a Delaware corporation headquartered in Georgia.  Normally, there is a "strong presumption in favor of the plaintiff's choice of forum that may be overcome only when the private and public interest factors clearly point towards trial in [an]alternative forum." *Schexnider v. McDermott, Int'l, Inc.*, 817 F.2d 1159, 1163 (5th Cir. 1987).  But when the plaintiff's chosen forum is not its home forum, the presumption in favor of that forum applies with less force. *Id.* (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981)).  As just demonstrated, the private and public factors strongly point to New Zealand as the more convenient and appropriate forum for this case, and given that Texas is not TenCate's home forum, the fact that it chose this forum is not sufficient to overcome the balance of these factors.

15

### C.   Return Jurisdiction Clause

The Fifth Circuit has held that when a court determines that a case should be dismissed on forum non conveniens grounds, "it must finally ensure that a plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice and that if a defendant obstructs such reinstatement in the alternative forum that the plaintiff may return to the American forum." *See In re Air Crash Disaster Near New Orleans, La.,* 821 F.2d at 1166; *Pan American World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989), opinion reinstated on other grounds, 883 F.2d 17 (5th Cir. 1989). "Failure to include a return jurisdiction clause in an f.n.c. dismissal constitutes a per se abuse of discretion." *Robinson v. TCI/US West Communications Inc.,* 117 F.3d 900, 907 (5th Cir. 1997). Notwithstanding the fact that this seems like a very remote possibility given the pendency of the New Zealand High Court case, and that court's explicit statement that TenCate's claims are proper counterclaims in that case, the dismissal of the instant case for forum non conveniens should be made subject to the following return jurisdiction clause:

> Notwithstanding the dismissals that may result from this order, in the event that the highest court of any foreign country finally affirms the dismissal for lack of jurisdiction of any action commenced by TenCate in these actions in New Zealand or the country in which it was injured, TenCate may return to this court and, upon proper motion, the court will resume jurisdiction over the action as if the case had never been dismissed for forum non conveniens.

### IV.  Jurisdictional Motions

Because the Court has concluded that dismissal of the case is advisable for forum non conveniens grounds, and because the resolution of the jurisdictional motions before the Court could be quite complex, it is appropriate to dismiss the case without addressing those motions. *Sinochem*, 549 U.S. at 425.  Having said this, the undersigned notes that I have reviewed those motions and all

16

of the related briefing in some detail, and had I reached **them I would likely have concluded that** personal jurisdiction over the foreign defendants was lacking.

## V.  Recommendation

For the reasons set forth above, the undersigned RECOMMENDS that the District Court GRANT Defendants' Motion to Dismiss for Forum Non Conveniens or, Alternatively, Abstain in favor of New Zealand Forum (Clerk's Doc. No. 77) filed September 24, 2012, and DISMISS Plaintiffs' claims WITHOUT PREJUDICE.  The Court FURTHER RECOMMENDS that the District Court within its order of dismissal the return jurisdiction clause set out above.  LASTLY, the Court RECOMMENDS that the District Court DISMISS all other pending motions in this case WITHOUT PREJUDICE.

## VI.  Warnings

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

17

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 3rd day of January, 2013.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE